and Ministry of Defense of the Republic of Iraq, Mr. Morag for the balance, Mr. Katyal for the appellee. Good morning, and may it please the court, Boaz Morag for the Republic of Iraq and the, what we call the Ministry of Defense. I've reserved three minutes for rebuttal. I'm happy to answer any questions that you may have. I'm happy to answer any questions the panel has with respect to the damages and issues and the cross-appeal. But I would like to focus my remarks on the grounds that we think are the most straightforward ones for the mandate reversal, which is that the district court erred in holding that IMOD's failure to pay the invoices that Wye Oak instructed be paid in Baghdad had a direct effect in the United States under Clause 3 of the Commercial Activities Exception of the FSIA. This is, as you know, a straightforward breach of contract case. The contract, the broker services agreement, was pitched by Wye Oak to IMOD in Baghdad, entered into in Iraq solely between Wye Oak and IMOD, and was for Iraq to refurbish or sell for scrapped military equipment in Iraq. It is governed by Iraqi law, and the Iraqi defendants had no contact whatsoever with the United States. And importantly, the BSA did not require or even contemplate any performance by Iraq or for Iraq in the United States. Let me ask you about that. In the letter accompanying Iraq's execution of the agreement, I'm quoting, this program will be administered with the assistance and cooperation of the United States military. Why isn't that sufficient to show there would be some performance in the United States? Because what that is referring to, Your Honor, is the assistance in Iraq, because the United States. Well, the United States military authority is here. Whatever happens in Iraq is going to be subject to direction from the United States. But the specific reference there to the bases where the Iraqi military equipment was located. And this is part of the transition from Iraq, from the coalition that had invaded Iraq and occupied it, transferring sovereignty back over to Iraq. Yes, there was a need for access that the Iraqis and Wye Oak needed to the Taji and Muqtadaa and other military bases. This this is not a direct effect on the United States based on the standard that the Supreme Court in Weltover and this court in I.T. consultants and cruise connections required an immediate, unavoidable or inexorable consequence. And that has to be in the United States. The other thing also provided that notice to begin of any circumstances was to be given to Wye Oak in Pennsylvania. Your Honor, probably because something was going on in Pennsylvania. No, that was simply where Wye Oak, as any U.S. plaintiff might be, had its had its address. No one has ever in the history of the F.S.I.A. relied on a notice provision to suggest that there is no claim here about the failure to give notice. Mr. Stoffel was doing things in the U.S. in furtherance of the performance of the contract. But that is the theory of the first judgment that was reversed by this court two years ago this month. Those that performance was not required by the contract or. And so therefore, it's not attributable in any way to Iraq. The fact where a U.S. contractor chooses to pursue administrative tasks, which are not specified as either required or necessary under the contract, is that it cannot create a direct effect in the United States. Recall that you've already decided that this case is simply the act for purposes of 1605A2. For the direct effect exception is the nonpayment of the invoice. That is the act that resulted in the failure of money that was due and owing in Baghdad to be delivered in Baghdad. The question is, what is the immediate, unavoidable and inexorable consequence of that act? And did it occur in the United States? The district court agreed that there was a direct effect in Iraq, but erred in in finding three other direct effects in the United States. And the reason that that's an error is because what the court found. Is not. The immediate consequence and an immediate meaning without interruption or intervening act, as your honor wrote in in the Prince case. It has to logically follow that there is no way of avoiding the storm. And what the trial court relied on was why Oaks reaction to the harm, why Oak did not receive money in Iraq. That's a financial harm to a U.S. company that the Valambia case and many others say is not sufficient to create a direct effect in the United States. There was letters that Iraq paid Mr. Zana and then Mr. Staffel directed Mr. Zana to pay that money into a U.S. bank account. So that is that not because because the Supreme Court is recognized even in Weltover that funds are supposed to go into U.S. bank accounts and don't are in a direct effect. Yes, your honor, that is the argument that the district court rejected that the that why Oak has raised on appeal. The reason that the district court got that right is because the the contract let why Oak specify where it was to be paid. It specified Baghdad. It insists and insists to this day. And and this court and the district court previously found that the breach occurred on October 28, 2004, when those invoices were not paid and they were paid immediately upon presentation. Subsequently. Why Oak sent an email to Mr. Zana asking for a piece of that money to be paid to it in the United States. There is no case in the history of the FSIA that permits a permits a plaintiff to after the breach has occurred, change the place of performance to the United States. The breach is either ongoing or repeated breaches here because they they Iraq chose to send the money to Mr. Zana instead of to them. And at that point, their ability to direct the form and manner of payment. They were responding then to what Iraq had done. And the complaint itself has a more sort of comprehensive view of what the breach is in this case. But the contractual by not paying these invoices, they breached their agreements. Their agreement, which was both in the contract 20 August 30 amendment reaffirmed in Baghdad in December. So this review in this contract and the obligation to pay a sort of an ongoing duty on behalf of Iraq until it actually did pay. And if its theory was, well, we paid Mr. Zana and they said, fine, send that Zana, send that money to the United States. So I don't it seems. But your honor, there was just one breach. And then all their efforts after that to get the money aren't relevant. You see, there's no case. There's a case in the opposite that subsequent efforts to direct the money are irrelevant for FSA purposes. All the cases say that the election of the United States has to be provided for in the agreement or agreed to by the sovereign before the failure to pay. But here the sovereign agreed we'll pay wherever you tell us to pay. Yes. And if they had said at the first point, hey, so if the contract is written exactly as it is and their first choice was pay us in the United States, here's a bank account in the United States and the money there, would that satisfy Weldover? Yes. OK, so then it doesn't have to be expressed in the contract. It has to be expressed by. Well, at least under this contract has to be expressed by a broker, which is why Oak and they expressed it. When Iraq misdirected money, your honor, several things. First of all, I misspoke. It would it would be acceptable. It would create a direct effect if when Iraq got that instruction, it agreed to do so before it decided not to pay. But the point here is that there's more than just the issue of the sequence. The what what distinguishes this case from every other where the person is owed money abroad and then comes back here and asks for it in the United States? The you the breach occurred where the first where the contractual obligation existed. The the the FSA and the SACs decision by the Supreme Court require the plaintiff to identify the gravamen of its claim. And the gravamen here is that these invoices were not paid. Every piece of damage that is the second half of this appeal. All they are still to this day asking for interest to accrue as of October 28, 2004. That's their choice. But that's the claim that they've asserted and that the district court ruled on. And they're still pursuing. That has a consequence for the for the based upon analysis, which is what is it based upon the act? It has to be based upon an act and that act has to create a direct effect in the United States. And so besides the issue of being able to. Direct change the place of payment after the breach. You also have the fact that, well, it changed again after that. So the point is that in December they had the meeting, which was changed to you will get paid in cash in Baghdad. So the only place that on this record Iraq ever agreed to pay, because there's this entire issue that the district court did not address. That we raised over Zaina's authority to act for Iraq on November 25th, 2004, the date he received the email. And the day after he responds, I don't have the authority to pay you or to pay me. We need a thought. We need authorization from the Ministry of Defense. So on this record, and that did not come. This part is undisputed until the December 5th all hands meeting in Baghdad. Any question about the Ambo? Sure. It doesn't. I think if I remember right, it does not discuss McKesson. And it does not cite McKesson. You have a theory for why? Because I think McKesson is sui gen is sui generous, as you made clear in Helmrich and Payne. McKesson is not a commercial contract case. McKesson is a case involving essentially an expropriation. And so what Iran did in McKesson, which Iraq did not do here, is it wasn't an issue of not paying. It was an issue of directing the dairy in which McKesson was an investor. That it would no longer deal with McKesson as a counterparty on a technical services agreement. Receive the goods and services that McKesson regularly sent over so that this dairy would create profits. I know. I mean, I know what McKesson says. And it sounds like your answer, which may be maybe the right answer, is that the Ambo tells us what to do in a contracts case. There are other precedents that tell us what to do in, let's say, a torts case. It's like the Venezuela fraud thing. And then McKesson maybe tells us what to do in a takings case or an expropriation case. Well, that's partly it. We're not we're not standing on a categorical distinction. We're just as to this is a contract case versus a tort case. But we're just trying to we're putting before the court the precedents that seem the most on point for the facts here. So what about cruise connections? Judge Ginsburg referenced the fact that, as you say repeatedly, this is a small company and it was a very big contract. And so they were going to have to have involved their employees here in the United States. Their computer equipments, their invoicing personnel here to help organize this very, very large contractual undertaking. How is that record here different from cruise connections? Because cruise connections, the entire subject matter, the raison d'etre of the contract that the Canadians terminated was the acquisition of goods, the cruise ships and services from the United States. In order to bid on the contract that cruise. That means because this is a U.S. company. And so everything this contract was doing was going to be obtaining services, skills, logistical support from the United States. So that can't be the test. And there's nothing that I saw in cruise connections that require that contracting with the U.S. cruise companies be done in the United States. You could do that contract from Canada or anywhere else. Yes, but the object of the contract was to obtain ships that were in the United States. The object here is to obtain skill and ability and functional resources from a company in the United States. I'm just struggling. I'm struggling with these lines as to when what you're doing in the U.S. matters and when it doesn't. I don't see how you can reconcile your prior decision, because you're attributing legal significance to whatever they did in the United States. That doesn't that doesn't qualify. Nothing. And what we did in cruise connections. No, because in cruise connections, what the court said. May I answer? What the court said was treat this as if you had a contract to buy one hundred million dollars of steel from a steel plant in the United States. That the Canadians then terminate. That has an immediate consequence, because you know that that steel has to be manufactured here because that's what the contract says. That is why the sovereign that's why the sovereign knows that it will have an immediate effect in the United States. If it terminates that contract, simply contracting with the U.S. entity. Why Oak was not required to spend a penny of its own money. The object was clearly activity that would take place in Iraq. The choice by why Oak to to use the brother in Pennsylvania to hold the computer, as opposed to an employee in Amman, Jordan, to do it. It's not it's not something that's attributable to the sovereign and cannot be seen anywhere in the contract. Those are distinctions that matter under your case. Yambo suggests that it needs to be expressed as long as it's implied or implicit in the contract. But there is no activity that is implied in the contract. You can't say for every contract there must be some sort of back office because then you have eviscerated the the direct effects test. Recall that when under the FSA, which the Verlinden opinion, the Supreme Court tells us requires a substantial connection to the United States. The direct effect, the inexorable consequence is the only U.S. connection. And so the fact that somebody in the United States. Choses as a result of not getting paid in Iraq to stop certain activities. Is not consistent with this idea that this should be a exception and not swallow the entire rule of presumptive immunity that Congress afforded. There really are not that many. This is. In terms of the sequence of events, very much like. How much in pain where you have. OK, there's an on payment. There's nothing stopping you from continuing to perform. Why does continue to perform until it decides when to stop? And it's entitled to do that. Thank you very much. We'll give you a couple of minutes on rebuttal. Thank you very much. Correct. Iraq refused to pay even after was president was brutally murdered and after 13 years of litigation, the district court held Iraq was not immune. And it breached the contract. Now, before this court, they're not contesting the breach. They just plead immunity. And last time, this court recognized a plausible basis for direct effect remanded for factual consideration. The district court did that, calling this a quintessential example of a clause three. That decision was right for three independent reasons. And notably, Iraq doesn't cite a single case reversing a district court's finding of a direct effect after a trial. Not one. And they bear the burden of proof. The first reason is that the district court correctly held that Iraq's failure. Ask a question based on some of the discussion with your opposing counsel. That is when it comes to the place of payment. I think Iraq would suggest that we look either to the time of contract formation or at the latest. We look right up to the moment for the breach. I assume. So you disagree with that, right? I do. I don't think it's necessary here. I'll explain that. But OK. I think part of the appeal of that is that. You can imagine concern about FSA waiver being a part of the bargain that was struck. And so if. If why, if why Oak had wanted and the effect of an FSA waiver, then probably they would have had to given something up at the time of contract formation. And if we can allow a post formation or the latest post breach conduct to have the effect of an FSA waiver, then it seems like we're upsetting the bargain that was struck. Yeah. So I'd say three things about that. First, just as a matter of housekeeping, there are three independent direct effects. This bank issue is one. The other is cut off a flow. And the other is the military impact. Judge Ginsburg was was pointing out they have to run the table and win all of them because it's a direct effect is the language of the statute. The second thing is, I think Welts over directly rejects your honor. That formulation, Argentina's brief to the court, I think, page 30 and 31 made a version of this argument and said this would open the floodgates. But what Welts over said is, look, there was first a breach. And then after that, the party specified the place of performance, the New York bank account. That's a page 610. And this court and I.T. consultants read it that way. So contract there pay anywhere contract or was it you're going to pay in one of two or three or four places? Pay in one of four places. The US was listed. The US was listed. Well, I think Judge Ginsburg points out that Valambia says you can have a contractual obligation or otherwise. So I think this court's already done that. And here, this contract, I think, for all the reasons that Ginsburg was pointing out with respect to the other piece of the direct effects, did contemplate a lot of U.S. performance. I mean, the whole question under direct effects is, is this an attenuated long chain of causation or is this natural and predictable? This is a U.S. headquartered company. Iraq is a war zone. It's not it's not unforeseeable or, you know, something that is not natural and predictable to expect that United States performance would be decision. Would you agree that the efforts to enlist congressional help executive branch help is not a direct effect? Oh, yeah. I don't think that by itself. We're certainly not saying that. I think we are saying the kind of thing that you said, which is the letter at joint joint appendix page, joint appendix page for 86, that this contract be administered with the help of the United States military in conjunction with the fact that this contract was all about standing up U.S. What is standing up Iraqi forces so U.S. troops could stand out? We had testimony from General Petraeus at this trial explaining that, as well as testimony from Bigodeer Clements and Mr. Beadle. That's a joint appendix pages 1405, 155 and 1067. This court routinely defers to military judgments and all kinds of circumstances. The execution of this of this contract involved military officials in the United States, as opposed to the military officials boots on the ground in Iraq. Well, I think what they said, and this is what the district court said, this is a joint appendix for 32 is, quote, unlike in the Prince case, there are no intervening actors that cut off the chain of causation between Iraq's nonpayment and the impact on the U.S. military's readiness to leave. That's a separate one. Are you involving the letter? Sounds like the military is going to be helping to execute this contract. But there's no evidence that actually any military resources located in the United States or military personnel in the United States were involved in the. I think that joint appendix page 429, the judge does say that both the Iraq's breach had a direct impact on U.S. military operations directed from the United States and operations directed from the United States. How general would this operate if it was? Well, this slowed down the Iraqis getting self-equipped and slowed down removal of U.S. forces from Iraq many, many, many years later. That's that's a different thing. Yeah, I don't think that's what the testimony was. And I think it's reasonable to infer, as Judge Ginsburg was saying, was that, you know, if there's an impact on U.S. military operations, if you're going to have to keep more troops there, which is what the testimony was, obviously, that's going to be something directed from the United States. It's after all, U.S. military. General Petraeus say outright we kept troops in Iraq longer because of this. I don't think he quite said that. But I think the testimony of all of those officials together does say that. And that is what the district court found at the page I read to you before. I think that is a clear finding by the district court. They'd have to reverse factors that went into when we're able to. And that's exactly what they argued at the district court. And that's exactly what the judge rejected after an eight day trial. And I don't I certainly don't think it's clear error to go back to the bank account point. I just want to make one final point, which is Judge Millett's point about how this is an ongoing duty to pay. And so it wasn't as if there was only a designation afterwards. And the district court here said, look, the big concern in these direct effects cases is some opportunistic behavior. And I take it that's true. Getting at the FSA waiver point and the district court rejected all of that on the facts of this case, saying that this was a contract that extensively required performance in the United States, that these opportunistic concerns don't apply. My point wasn't that opportunistic behavior occurred here. My point was it would seem odd, I think, to create a legal rule going forward that would either incentivize opportunistic behavior or disrupt the bargain that was struck. Oh, yeah. So, no, because after all, the contract, you know, any one in the future, if they're worried about this would just not agree to a place of payment clause, a unilateral place of payment clause, the one that's in this contract. But these folks agree to that. So that is the third direct effect. The second one is the impact on the military. The first we haven't even gotten to talk about yet is the cutoff and the analogy to McKesson. And my friend's best argument on the other side is that it has to be unavoidable and inexorable. There is no case that says anything like that is part of the legal standard. It is true that there's an offhand observation in I.T. consultants saying that in that case, that it was sufficient to establish a direct direct cause that was unavoidable. On that point, let's assume that there was a cutoff of capital personnel data and intangible services between the United States and Iraq. Whose decision was it to cut it off? It was the natural and predictable result of Iraq. It's no different, Your Honor. Not when it was whether it was foreseeable, but who made the call? Somebody made the call. Yeah, I think Iraq did. And it's just like here's an example. I don't pay my electricity bill, OK? And the electric company keeps the lights on for a while as they do. And then ultimately they turn them off. Nobody would say my lights being turned off is the result of of my of the electric company. Yes, they made the final. There's merit to that. I think that is different than McKesson. Because in McKesson, like Iran was the electric company. They shut the lights. So I think that's actually not right on the facts of McKesson. You can play the exact same games about the choice. So this court in McKesson, this is a 271 F3rd 1104, said it was a U.S. company that made the choice to withdraw the U.S. personnel. Paragraph 35 of the complaint, which is in their own appendix at page 34, says that McKesson made that choice really reluctantly. And indeed, they kept the personnel in Iran after nationalization because it was part of their duty to mitigate. And that's exactly what happened here. They didn't pay their bills. We tried to keep things going as part of our duty to mitigate. We couldn't do that ultimately for too long, because as the district court acknowledged in the cites to this or our brief pages 20 to 21, when someone doesn't pay, particularly when it's a small company and a big contract, you can only keep going for only so long. And it is as EIG says, which is a case that's buried in their reply brief. You look to what is the natural and predictable results when a foreign sovereign takes that action. The natural and predictable result of not paying these, you know, tens of millions of dollars is that. I think you're going to disagree with this. So tell me why it's wrong. McKesson tells us what to do in an expropriation case. EIG tells us what to do in a tort fraud case. Modambo tells us what to do in a contract case. Yeah, I don't think I don't think that there are different standards for direct effects in each of those. I think the answer to your question about why Odeonbo doesn't cite McKesson is because in Odeonbo, in Odeonbo there was zero U.S. performance whatsoever. And that's why it didn't have any analogy to McKesson. Here, as Jamal was saying earlier, there's all sorts of stuff that is happening in the United States performing under this contract. If you look at volume four of the joint appendix, it's hundreds of pages about what's happening in the United States. At the time of contract formation, was it kind of inevitable in the eyes of Iraq that those things would be happening in the U.S.? And one reason I ask is I think a lot of the equipment was probably Soviet era supplied equipment. So, you know, if Iraq had to take a guess on who was going to be subcontracting with it, they might have guessed, you know, Russian or Eastern European subcontracts. So two things, Your Honor. One is Cruise Connections directly forecloses that argument, as I think Judge Mollet was saying earlier. It expressly says the foreign government doesn't need to agree in the contract to U.S. performance. Cruise Connections, the American subcontracting was expressed in the contract. Well, just the U.S. headquarter of the two subcontractors, which is, of course, true here. You know, paragraph 11 of this contract says why is headquartered in the United States? Contractor, but not the subcontractor. Well, I think if anything, that cuts the other way. Again, the whole question is. You have to come up with a rule that doesn't mean every time an American company does business with a foreign government that you went on direct effect. Yeah, and that's certainly not our argument. If there's background. For every small company. Yeah, but I think here the question is, you know, and here as this case comes to the court, the district court made clear factual findings that with respect to this company, unlike in how American pain and where there was no factual developments. But in this company, if you cut off funds, you were starving them of the capital necessary to perform the contract. That's what the district court said repeatedly, including a joint appendix, page 421. And indeed, even this court. That's not an effect in the United States. Starving them off from the ability to execute the contract in Iraq does not necessarily mean an effect in the United States. Well, given that all the ongoing performance of the district court isolated, it is it's it's direct. It's not a long chain of causation. It is the most natural thing in the world. They are noticing the contract. That they were going to be responsible for these activities in the US because it was this unusual contract where they said they were laying out money, working with the military folks in Iraq. It was just unusual. So, yeah, I'd say two things about the honor. First is it's at least as is foreseeable as in cruise connections, of which the only mention was a U.S. headquartered subcontractor here for getting U.S. cruise ships. And so that's going to if you're U.S. based and you're scheduled with, you're supposed to make contracts for them with U.S. Well, again, I don't know that they're supposed to be with the U.S. ships as part of the contract was U.S. cruise ships.  cruise ships. Absolutely. They turned out to be just as here, even accepting your premise, it turned out to be performance in the United States. I think it stands to reason the contract itself recites Wyoch's extensive experience in the area and David Stoffel. And he's, of course, based in the United States. Second thing I'd say is it's not different than this court's decision in Dispel, which involved there wasn't even a written contract at all. Certainly nothing there saying U.S. performance. But Hungary had agreed to promise to return the arts and art in that case to the Herzog family. Some of those members resided in the United States. This court found that enough to be a direct effect. And here is this case comes to the court. You have the district court saying, look, this is natural and predictable. The contract's being performed largely. When is it not going to be natural and predictable that reaching a very multimillion dollar contract in a foreign country is not going to have a direct effect on the operations of the company in the United States? Yeah, I think at least in a circumstance like this in which it's a U.S. headquartered company with extensive United States expertise at a time when, as the district court found, there were all sorts of technological limitations in Iraq. So there was no real functioning Internet, no real functioning banking system and the like. A lot of that is going to have to happen in the United States. This is well before cloud computing and things like that. And this required, as the entire volume four of the Joint Appendix shows, the construction of a very extensive database in order to try and. It sounds like in any country that is either, whether for war or other reasons, is underdeveloped industrially that you're going to have a contract with the United States company is going to mean direct effects in the United States. I think, again, the question is, would it be natural and predictable for a contract at this point in time in 2004 to be performed in the United States? We don't get to decide. We don't get to write an opinion that says this is good for 2004. And so I understand talking about a wartime there, but there's contractors, military contractors, all kinds of contractors all over this world, all over this world. And they're U.S. based companies. And there's no doubt that they are having communications with no doubt that logistical issues are affecting you, that the probably even directed by folks in the U.S. offices. And I'm just very worried about I don't understand how you write the opinion. How would you write the opinion that says I think you were for one ticket to get one. I'm not suggesting quite that. I am just saying on the facts of this case, all you'd have to do, I think, is say, look, Judge Lambert found at this moment in time, there were technological limitations, which made it absolutely foreseeable. And a natural and predictable result that someone who's signing this contract with a U.S. headquarter company involving United States experience of its personnel, its key personnel, that is going to be performed in the United States at this moment in time. Some other contract could be done differently. And, of course, the United States experience of its personnel. Well, I mean, that these are, you know, the Stouffels were United States people. They were, you know, you know, they had hypothetical. That's any question this U.S. based companies. Yeah. And I think, you know, if you have I mean, if if if you have a contract with some other company is not have the locus of its expertise in the United States, I think it becomes less than natural and predictable results. But on these facts, as this district doesn't have any reassurance, an opinion that means every time a U.S. based company send some people overbroad to help overseas to help execute a contract in a foreign country that they're not always going to have. Well, I think that, again, I think it may be different now because of the role of technology and the fact that there's cloud computing, it'd be harder to anticipate performance in the United States. And then if the logistical designs are put on computers and created in the United States, if the spreadsheets are all done in the United States, if how we're going to have great tech here, not great tech there. Are we going to bridge that is decided in the United States? They're all going to be quite understanding. Your Honor, if you're worried about that, I think the answer to that is I was saying to Judge Walker that the contracts itself can specify whatever they want about performance. I could say it's not performed in the United States or whatever, but at least in a contract like this in which I think all the addition hallmarks are that this is the natural and predictable result. That's enough. And of course, that's only about direct effects. We haven't talked about the impact on the military or the bank account is two other reasons for it for direct effects. If I could, can I can I read a couple of things from the reply brief? I suspect you agree with some of these statements and disagree with them. I just want to know agree or disagree. Why pitch the contract in Iraq? Why pitch the contract in Iraq? Yes. Signed the contract in Iraq. Yes. Governed it under Iraqi law. Yes, I think you're going to disagree. Well, the contract itself says that, but then obviously, as we our briefs explain in the district court, there were all sorts of concessions with respect to specific arguments that Iraqi law wasn't different than the United States law was not. And then I think you disagree with this while was to perform all work under the contract in Iraq. Oh, yeah, absolutely disagree. And my friend on the other side said that part of it. Yeah. And then and then and then this is not from the reply brief, but David Stoffel continue to perform up to the January twenty five election. Is that right? I think that's about right. I'm not sure about the exact date, but yes, there was continued performance for a couple of months and U.S. officials, Senator Santorum, Sarah. They took no action after the breach until we reached out to them. I'm not quite sure about whether that's true or not. You know, it was the case that that that that the Joint Appellate's pages five eighty four and four twenty nine. The district court says that the reason why U.S. officials got diplomatically involved was because of the failure to pay. But what actions did they take before we reached out to them? I'm not sure they took actions necessarily before, but they certainly did. Once there was a failure to pay after the breach. Notify somebody in the U.S. military about the breach. I think it was done pretty quickly. I mean, probably a matter of weeks. I'm not sure exactly, but it was a fairly fast, rapid situation because this contract was so important to the United States. For reasons Judge Ginsburg was saying so important to Iraq right before the elections that everything was done to try and make sure that that contract was preserved. And we're certainly not saying that alone is enough of a direct effect. We talked earlier about what General Petraeus did and didn't say. Just in terms of your contention, is it your contention that if Iraq had not breached the agreement, U.S. forces from Iraq would have returned sooner? Some U.S. forces would. No, we're not saying every troop would have come home, but that was the testimony at the trial. That's what Judge Lamberth found after hearing that after eight days. I think this is my last question, but as you know, Odeonbo has some language, very unhelpful view. For example, breaching a contract that establishes a non-U.S. place of performance can affect the United States only indirectly as the result of some intervening event. Do you think we have to at least disagree with the language in Odeonbo in order to side for you? I don't think so. So first of all, that is only going to get to the cutoff of funds thing. I think it won't get to the military impact that Judge Ginsburg was isolating or the bank account that Judge Millett was getting to. But with respect to the language from Odeonbo, that case had no United States connection at all. It involved no performance by any party in the United States. It was just brought by someone who brought you in. That's an argument that Odeonbo's holding doesn't control. And I know you think that, but the language that it gets repeated at least twice expressly in Odeonbo. And then, as you know, I think it was Judge Pillard says, you know, I don't agree with this language in Odeonbo. I guess I'm asking, do you agree? So I think it could be read more loosely, and I think you should read it that way. I think Judge Millett in the Kasem versus Trump case said, you've got to read cases in light of this court's decisions in light of other decisions. And to read it for all it's worth, the way that I think my friend on the other side is, would run it headlong into EIG after all, which says it's the natural, unpredictable result that is the relevant test. And so I would just, I agree, Odeonbo is their best case on the cutoff of funds. I just don't think it could be read to be that way, because if it is, then EIG, I think, comes out the other way. McKesson, as I was explaining to you, would come out the other way, because it was the U.S. company's choice to keep its personnel there after the nationalization. And, you know, I think it's also inconsistent with Volambia, as I was saying to Judge Ginsburg earlier, because that's a case that says it doesn't need to be in the contract expressly. It's contract or otherwise is the relevant language in Volambia. And the last thing I'd say about this is... Very, very, very fast. The last thing I'd say about this, my friend makes a big point about immediate in his briefs, but there's two different senses of the word immediate. One is causal and one is temporal. It's clearly, the use of that phrase in Weltover is clearly causal, because the language at page 618 of the Supreme Court decision says, we agree with the Court of Appeals about the test. And the test from the Court of Appeals, and this is 941 F. Second 152, is that, quote, an effect is direct where there is no intervening element. Here, for those three direct effects, there's no intervening element. Thank you very much. All right, Mr. Moorag, we'll give you two minutes for rebuttal. Thank you. First, just some points on the case law that was raised. The Shepell clearly is about the decision... What it found was that Hungary had promised to make specific performance obligations in the United States. That's what was alleged. That's what Judge Tatel relied on for his decision. This test that's being referred to about the natural and foreseeable was in fact rejected in Weltover, because this is a question where foreseeability was rejected. Yes, it is causal, but it's a proximate cause analysis. It's not a but. You don't look at every but for issue. And the point of that is that you look at what the sovereign was required to do, and you look at what happened next. All of these points about why Oakes... It has to matter whether why Oakes could perform for three months or three years after the breach that it claims is the gravamen of this offense. Can I follow up? I thought I heard you say that Iraq agreed to pay in cash in Baghdad for this contract performance. Does the record say somewhere that it was in cash? Yes, I believe so. That was the whole point. In December? That Mr. Stoffel left the Taji base to pick up the funds in the green zone in Baghdad. Well, he says you arrange for the payment and get it. So that could equally mean he was going there to arrange a wire transfer to the U.S. There were no wire transfers going on. There's testimony about that from Captain Neal that wire transfers were not happening. That's why everyone understood that this payment would have to come in Iraq, as it in fact did come to Mr. Zayna for reasons having to do with... Do you have a record citation for where it was going to be in cash? Or not off the top of your head? The description in the 2019 decision by Judge Lambert discussing the events, and there's an email that was sent before the date where Mr. Stoffel says, I'm going to get the money. Whether it's a cash or a check, it was still going to be some instrument in Baghdad. Okay. Thank you. Thank you very much. Mr. Caldwell, you wanted to reserve one minute for your cross appeal. I'm not sure it has come up at all in oral argument, but if there's something that you fairly want to say on that issue, feel free. But otherwise... Just that we isolate three reasons on the cross appeal for why the district court made some errors, and we think it should just be remanded for discussion of those. If there are any other questions. Thank you very much. The case is submitted. Thank you.
judges: Millett, Walker, Ginsburg